UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
x

In re:

PLATINUM PARTNERS VALUE
ARBITRAGE FUND L.P.
(IN OFFICIAL LIQUIDATION), *et al.*,

Debtors in Foreign
Proceedings.

Chapter 15
Case No. 16-12925

25-cv-8948 (CM)

x

MICHAEL M. GOLDBERG,

Appellant,

-against-

PLATINUM PARTNERS VALUE
ARBITRAGE FUND L.P.,

Appellee.
x

**OPINION AND ORDER AFFIRMING THE BANKRUPTCY COURT'S SUMMARY-JUDGMENT ORDER, DAMAGES ORDER, AND FINAL JUDGMENT**

McMahon, J.:

This appeal arises from a seller-financed transaction that the parties agreed to but never completed. Appellant Michael M. Goldberg and Platinum Management (NY) LLC ("Platinum") entered into binding agreements (memorialized in certain "Term Sheets") pursuant to which certain investment funds managed by Platinum were to transfer specified securities to Goldberg in exchange for Securities Loan Notes issued by Goldberg. The securities were then to be deposited into brokerage accounts owned by Goldberg, subject to first-priority, perfected security interests

in favor of Platinum or its affiliates. The parties do not materially dispute what did and did not occur. Their disagreement centers on whether execution of the Term Sheets transferred ownership of the securities to Goldberg or whether PPVA still owned them when its Cayman Islands liquidation commenced.

Execution of the Term Sheets did not effect any transfer of ownership in the securities. The Term Sheets created a binding agreement to transfer certain securities to Goldberg in exchange for consideration in the form of Notes. The language of the contract contemplated future performance, not executed performance. Per the Term Sheets, Platinum stated that it "wishes, subject to the terms and conditions described herein," to "cause" the relevant funds "to transfer" the securities to Goldberg, who in turn "shall issue" Securities Loan Notes "In consideration for the Transferred Securities." That is the language of future performance – Platinum will do something in the future, in exchange for something that Goldberg was to do in the future. The Term Sheets also provided that the securities "shall be deposited" into controlled accounts securing the Notes and provided instructions for how to set up such accounts – the accounts were not created prior to the execution of the contract. App'x 336–39.[1] The Term Sheets do not say that the funds "hereby transfer" the securities, that title would pass upon execution, or that Goldberg would own the securities before tendering the Notes that constituted the agreed-upon consideration. In short, the contract language contemplates future and reciprocal performance; it did not either effect or memorialize an immediate conveyance of legal title.

[1] Unless otherwise indicated, citations to "App'x" refer to the paginated Appendix of Appellant. Citations to "Adv. Dkt. No. __" refer to filings in *Platinum Partners Value Arbitrage Fund L.P. v. Goldberg*, Adv. Proc. No. 18-01650 (Bankr. S.D.N.Y.). Citations to "Ch. 15 Dkt. No. __" refer to filings in the jointly administered Chapter 15 proceeding, *In re Platinum Partners Value Arbitrage Fund L.P.*, No. 16-12925 (Bankr. S.D.N.Y.).

The bankruptcy court characterized the Notes and controlled-account requirements as express "conditions precedent" to any transfer of ownership. Because Goldberg had neither issued the Notes nor established the required accounts before Plaintiff-Appellee Platinum Partners Value Arbitrage Fund L.P. ("PPVA") entered liquidation in the Cayman Islands, the bankruptcy court granted PPVA summary judgment on its turnover claim. App'x 69–80. Following a bench trial, it awarded PPVA $4,069,186.06 in turnover damages and $3,052,224.00 in prejudgment interest. App'x 96–130.

This Court affirms the result. Whether the Notes and controlled-account provisions are more properly classified under New York law as express conditions precedent to the transfer of ownership (as the Bankruptcy Judge held) or as binding promises (as Appellant argues on appeal), the result is the same – PPVA, not Goldberg, owned the "Transferred Securities" when it went into liquidation. The Term Sheets impose reciprocal obligations on the parties; those obligations were never fulfilled, by either side. Goldberg never issued, or offered to deliver, the Securities Loan Notes that constituted the consideration for the transfer of the securities. And the securities were never deposited into accounts owned by him following the execution of Securities Account Control Agreements that were to give rise to Platinum's bargained-for security interest. Neither side kept its promises to the other; as a result, the transaction contemplated by the Term Sheets never closed, and Goldberg did not acquire ownership of the securities prior to the commencement of the Cayman liquidation.

Accordingly, the Court AFFIRMS the bankruptcy court's grant of summary judgment to PPVA, its denial of Goldberg's cross-motion for summary judgment, its damages award, and the final judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Except where otherwise indicated, the facts bearing on the summary-judgment ruling are undisputed and are drawn from the summary-judgment record. The evidence received at the later damages trial is discussed separately in connection with Goldberg's challenges to the damages award.

### A. Goldberg's Separation from Platinum

PPVA is a Cayman Islands exempted limited partnership that operated as a multi-strategy hedge fund. Platinum Management (NY) LLC ("Platinum" or "PMNY") served as PPVA's general partner and investment manager. App'x 62, 361–62. From 2007 until December 2013, Goldberg worked as a portfolio manager for Platinum, where he managed investments in healthcare and life-sciences companies, including Navidea Biopharmaceuticals, Inc. ("Navidea"). App'x 62. Goldberg joined Navidea's board of directors in November 2013 and left Platinum the following month. *Id.* The parties' separation documents referred to amounts owed to Goldberg for services rendered through his departure as the "Services Payment"; the Amended Term Sheet later specified that the Services Payment would be "an amount up to $4,000,000.00." App'x 328, 336, 339.

Goldberg and Platinum memorialized the principal terms of their separation in a Confidential Binding Term Sheet effective March 28, 2014 (the "Original Term Sheet"). App'x 328–34. Goldberg signed the Original Term Sheet on his own behalf, and Mark Nordlicht – Platinum's co-founder and the chief investment officer – signed it on Platinum's behalf. App'x 62, 334.

The Original Term Sheet described itself as a "legally binding agreement" that would remain in effect even if the parties did not execute more formal documentation. App'x 328. It

stated that Platinum "wishes, subject to the terms and conditions described herein, to cause certain of the private investment funds under its management (collectively, the "Platinum Funds") to transfer to Dr. Goldberg certain positions held by them as of December 31, 2013," which the agreement defined as the "Transferred Securities." *Id.*

The attached Schedule 1 identified securities with an aggregate December 31, 2013 fair value of approximately $16.14 million – far more than the $4 million that represented the maximum amount of the Services Payment. App'x 334. Among the securities to be transferred were 1,655 shares of Navidea Series B Convertible Preferred Stock held by PPVA. These shares were convertible into 5,411,850 shares of Navidea common stock. Schedule 1 assigned the 1,655 preferred shares a fair value of approximately $11.20 million. *Id.*

The Original Term Sheet contained several provisions relevant to this appeal.

*First,* "In consideration for the Transferred Securities," the Original Term Sheet obligated Goldberg to issue, to certain funds managed by Platinum, five-year Notes in an aggregate original principal amount equal to the fair market value of the Transferred Securities as of December 31, 2013, "as reflected on the Platinum Funds' books and records." App'x 329. Although the agreement stated that the Notes would be "in the form of Exhibit A attached hereto," the record does not indicate that any form of Note was attached to the Original Term Sheet. *Id.*; *see* App'x 328–34. However, the Original Term Sheet provided that the Notes to be issued by Goldberg "in consideration for the Transferred Securities" would bear interest at two percent per annum, compounded annually. App'x 329. The Term Sheet did not identify the particular Platinum Funds to which the Notes were to be issued, or allocate the aggregate principal amount of the Notes among the Funds that were to receive the Notes. Instead, Goldberg was to issue the Notes to "one or more of the Platinum Funds, as directed by Platinum." *Id.* Platinum therefore had to identify

the appropriate Noteholders before Goldberg could issue the contemplated Notes – a task that remained to be accomplished.

*Second,* the Original Term Sheet provided that "The Transferred Securities shall be deposited into one or more segregated brokerage accounts owned by Dr. Goldberg," each of which was to be subject to a Securities Account Control Agreement in favor of Platinum or its affiliates. *Id.* The parties expressed their intent that Platinum or its affiliates would possess "a first priority, perfected security interest in the Accounts." *Id.* The Term Sheet did not specify the terms of the control agreements or the identity of the custodian of the accounts; it provided only that custodian and the terms of each control agreement "must be reasonably acceptable to Platinum." The as-yet-unidentified Noteholders – the Platinum Funds to which Goldberg, at Platinum's direction, was to issue the Notes – were required to "use [their] reasonable efforts to obtain all waivers and consents (if any) required to transfer the Transferred Securities into the Accounts from the issuers of the Transferred Securities." App'x 330. Goldberg, in turn, was required to "reasonably cooperate in such process." *Id.*

*Third*, the Original Term Sheet stated: "Dr. Goldberg shall have sole voting and dispositive power over the Transferred Securities." App'x 329. Goldberg contends that this provision immediately vested him with "beneficial ownership" of the securities; PPVA contends that it identified the voting and dispositive authority Goldberg would possess upon completion of the contemplated transfer. As discussed below, the Court concludes that this provision did not in and of itself convey ownership of any shares to Goldberg. Thus, the Court need not decide precisely when the voting and dispositive authority contemplated by that provision would have come into effect.[2]

[2] The Original Term Sheet addressed the relevant components of the transaction in steps. It first provided that Goldberg would issue Notes "in consideration for" the Transferred Securities; it next provided that Goldberg "shall

On June 11, 2015, Goldberg and Platinum executed a First Omnibus Amendment to the Confidential Binding Term Sheet (the "Amended Term Sheet" and, together with the Original Term Sheet, the "Term Sheets"). App'x 336–41. The Amended Term Sheet provided that the amendments set forth therein would become effective on June 11, 2015, while all provisions not expressly amended would remain effective as of March 28, 2014, the effective date of the Original Term Sheet. App'x 336. The amendment extended the term of the Notes that were to be issued in exchange for the Transferred Securities from five to seven years, modified the threshold at which the Notes could be accelerated, restructured provisions governing the Services Payment and certain "Participation Securities," and addressed certain other limited-partnership interests owned by Goldberg. App'x 338–39.

The Amended Term Sheet did not, however, alter any of the provisions in the Original Term Sheet setting forth the parties' reciprocal obligations: Goldberg's obligation to issue Notes to the specific Funds designated by Platinum in consideration for the Transferred Securities, the requirement that the securities be placed in segregated accounts subject to control agreements and perfected security interests, or the provision granting Goldberg sole voting and dispositive power over the securities. *Id.*

No separately executed instrument in the contemplated form of a Securities Loan Note appears in the record. Goldberg maintained that the executed Term Sheets themselves constituted the required notes; PPVA disputed that characterization, and the bankruptcy court ultimately

have" sole voting and dispositive power over those securities; and it then provided that the securities "shall be deposited" into controlled brokerage accounts. App'x 329–30. This ordering is consistent with the view that Goldberg's voting and dispositive authority would arise when he paid for the securities by issuing the Notes, even if the securities had not yet been deposited into the controlled accounts, and would suggest that, because Goldberg never issued or tendered the Notes, he never acquired that power. But as discussed, it is not necessary to reach any conclusion about whether or when Goldberg acquired voting and dispositive power over the Transferred Securities; that is irrelevant to the result.

rejected it. App'x 77–78. Likewise, no Securities Account Control Agreement was executed before August 23, 2016. Communications between the parties during September and October 2016 – weeks after the Cayman Islands liquidation commenced – show that Goldberg and Platinum representatives were still discussing with Merrill Lynch how to establish an account with the required controls. Those communications also clearly indicate that Platinum insisted on retaining possession of the securities until the controlled account was established. App'x 75–76.

### B. The Exchange of the Preferred Shares for the PPVA Warrant

On August 20, 2015, PPVA and Montsant Partners LLC entered into a Securities Exchange Agreement with Navidea. App'x 401–14. Under the Exchange Agreement, each of the two "Investors" agreed to surrender the Navidea Series B preferred shares listed opposite its name in exchange for a twenty-year warrant to acquire the corresponding number of Navidea common shares. App'x 403. The agreement identified PPVA and Montsant – not Goldberg – as the "Investors" who were obligated to surrender Preferred B shares in exchange for the Warrant. App'x 401. The Warrant received by PPVA in exchange for the Series B preferred shares will be referred to in this opinion as the "PPVA Warrant."

In the Securities Exchange Agreement, each Investor represented that it "owns and holds, beneficially and of record, the entire right, title, and interest in and to" the preferred shares attributed to it, free and clear of any claim, restriction, or lien other than specified securities-law restrictions. App'x 405. Exhibit A identified PPVA as the Investor holding 1,655 preferred shares, which Investor was entitled to receive a warrant covering 5,411,850 common shares. App'x 413. These were the same 1,655 preferred shares identified as "Transferred Securities" in Schedule 1 of the Term Sheets. App'x 334, 341. So, in the Securities Exchange Agreement, Platinum averred that it, not Goldberg, had title to the shares it was exchanging for the PPVA Warrant.

Goldberg, who was at the time a Navidea director, participated in the board meeting at which Navidea authorized the Securities Exchange Agreement and the issuance of the warrants. App'x 357–59. At trial, Goldberg acknowledged that he was aware of the Securities Exchange Agreement when the Navidea board approved it. He raised no concern about the fact that the Agreement identified PPVA as both the beneficial and record owner of the 1,655 preferred shares; he did not indicate that PPVA's representation of record and beneficial ownership was in any way erroneous. App'x 1136–39 ("Q: You say you assumed [PPVA was] the owner? A: Correct."). And Goldberg did not insist that the Warrant should actually issue to him because he was the actual owner of the Preferred B shares and had been since execution of the Original Term Sheet.

Pursuant to the Securities Exchange Agreement, Navidea issued Warrant No. WLL15-002, dated August 20, 2015, to "Platinum Partners Value Arbitrage Fund, L.P. or its registered assigns" (the "PPVA Warrant"). App'x 416. The PPVA Warrant permitted the holder to purchase 5,411,850 Navidea common shares for one cent per share commencing on the date the Warrant issued and ending on August 20, 2035 (the "Term"). *Id.* It also provided that a transfer was to be effected on Navidea's books upon surrender and endorsement of the Warrant and payment of any required transfer charges. App'x 418. The original wet-signed PPVA Warrant remained in PPVA's custody at BNY Mellon. App'x 65.

Section 7(b) of the PPVA Warrant prohibited the holder of the Warrant from exercising the Warrant at any time during the Term if the resulting issuance would cause the holder and its affiliates collectively to become the beneficial owners of more than 9.99% of Navidea's outstanding common stock (the "Blocker"). However, that restriction could be waived if the holder of the Warrant gave the Issuer (Navidea) sixty-one days' notice of the holder's desire to exercise the Warrant in whole or in part. App'x 423. The 9.99% threshold tracked the more-than-

ten-percent ownership threshold relevant to the short-swing-profit provisions of Section 16(b) of the Exchange Act. *See* 15 U.S.C. § 78p(b). The Blocker applied to whoever owned the Warrant, not just to PPVA, the original holder of the Warrant.

The Blocker restricted exercise depending on how much Navidea stock the holder of the Warrant owned. Navidea issued the Warrant to PPVA on August 20, 2015. App'x 416. By April 2016, PPVA and the affiliated Platinum reporting persons reported that they beneficially owned 9.99% of Navidea's common stock, thereby triggering the Blocker. Six months later, in October 2016, Navidea advised that PPVA could not exercise the Warrant because doing so would cause its beneficial ownership to exceed the Blocker's threshold. App'x 482–83, 553.

Goldberg, by contrast, held substantially fewer Navidea shares. The shares underlying the Warrant represented less than four percent of Navidea's outstanding common stock as of October 17, 2016, and Goldberg's last Form 4 filed prior to the liquidation, on July 7, 2016, reported that he beneficially owned just 403,152 Navidea shares. App'x 709, 946–48. Thus, exercise by PPVA would have triggered the Blocker, while exercise by Goldberg would not.

### C. The Parties' Pre-Liquidation Treatment of the Separation Transaction

The parties have introduced voluminous extrinsic evidence about the ownership of the Transferred Securities. Because the Court concludes that the Term Sheets create a contract that is unambiguous, none of this evidence is relevant to the outcome of the case. The Court nonetheless discusses it because the parties rely heavily on it and it forms a substantial part of the record.

This extrinsic evidence – which principally consists of public disclosure statements filed by Platinum, Goldberg, and Navidea, together with certain Platinum accounting records – does not speak with one voice about the legal status of the Transferred Securities. And ironically, Goldberg's and Navidea's statements of beneficial ownership contradict Goldberg's position in

this lawsuit, while at least one of Platinum's public filings appears to contradict Platinum's litigation position.

PPVA's audited consolidated financial statements for the year ending December 31, 2014, recorded a $16,142,504 "notes receivable" asset arising from the Goldberg separation transaction. App'x 495, 530. The accompanying notes stated that PPVA's general partner had entered into a separation agreement with a former portfolio manager and that, as part of that agreement, "the Master Fund agreed to transfer certain investment securities it owned to the former portfolio manager in exchange for notes receivable" totaling $16,142,504. App'x 530. The notes further stated that the notes receivable were to be collateralized by the transferred securities and would bear interest at two percent per annum for five years. *Id.* Those same financial statements reported that PPVA was "still maintaining custody of the transferred securities." App'x 531. For purposes of its own financial statements, PPVA continued to include the securities among its investments and recorded a corresponding liability of equal value. *Id.* Thus, despite describing the securities as "transferred," PPVA did not remove them from the investments reported on its balance sheet; it continued to carry the securities as assets, offset by a corresponding liability. In short, PPVA's audited financials did not reflect any completed transfer of ownership of the shares to Goldberg – which is consistent with its position in this lawsuit.

A July 9, 2015 confidential, internal memorandum prepared by Trey Rogers, Platinum's Director of Financial Reporting, characterized the transaction differently. App'x 543–45. The memorandum stated: "Platinum gave up voting and dispositive power over the securities, in exchange for the note." App'x 544. It further stated:

> Although the securities have not been transferred into one or more segregated brokerage accounts, the fund believes it does not have control or ownership of the

> securities. Given the transfer of voting and dispositive power, the transaction constitutes a legal transfer and not an assignment or participation in the securities.

App'x 545. The memorandum further stated that the fund had disclosed publicly and to the Securities and Exchange Commission that it did not own the securities, although it did not identify the particular disclosure to which it referred. *Id.*

The memorandum treated PPVA as owning "a note due from Dr. Goldberg," notwithstanding the fact that no such Note had ever been issued by Goldberg. *Id.* Read in context, the reference to a Note "due from Dr. Goldberg" is most naturally understood as treating PPVA as being entitled to receive a Note from Goldberg; it does not establish that Goldberg had already issued or executed any such Note, and we know from his own testimony that he did not. *Id.* But at least arguably, Rogers' non-public statement, made in an internal Platinum memo, is contrary to the position PPVA now takes in this lawsuit. PPVA contends that Rogers' observations reflect accounting judgments and assumptions rather than binding legal conclusions about ownership; Goldberg relies on them as evidence that PPVA recognized that beneficial ownership had already passed to him.

Then there are the parties' various 2016 SEC public filings. Fairly read, these indicate that everyone disclaimed beneficial ownership of the Navidea stock underlying the PPVA Warrant.

An April 2016 amendment to Schedule 13D[3] filed by PPVA, Platinum and related reporting persons excluded from their beneficial-ownership calculation of Navidea stock "5,411,850 shares of common stock *owned by Dr. Michael M. Goldberg*" pursuant to the Term

[3] Schedule 13D is the form prescribed by the SEC for a person who acquires beneficial ownership of more than five percent of a class of equity securities registered under Section 12 of the Securities Exchange Act of 1934, unless the person is eligible to report on Schedule 13G. *See* 15 U.S.C. § 78m(d)(1); 17 C.F.R. §§ 240.13d-1(a), 240.13d-101.

Sheets, and stated that the agreement "provides that Dr. Goldberg has sole voting and dispositive power over those securities." App'x 483.

Navidea's Form 10-K for the year ending December 31, 2015, which was filed on March 23, 2016, included a table reporting the beneficial ownership of its principal stockholders, directors, and executive officers.[4] App'x 563–64, 1433–34. The table listed Goldberg as beneficially owning 331,572 shares and Platinum and its affiliates as beneficially owning 15,330,083 shares. Navidea's filing did not indicate that Goldberg beneficially owned the 5,411,850 shares represented by the PPVA Warrant. Indeed, a footnote to the table stated that Goldberg's total "does not include 5,411,850 shares of common stock that the Company believes Dr. Goldberg *has the right to acquire* from Platinum," – even though the same footnote acknowledged that the Term Sheets granted him "sole voting and dispositive power over these securities." App'x 563–64. Thus, Navidea characterized Goldberg as having only a right to acquire the shares from Platinum – not as already owning them, beneficially or otherwise.

Navidea's 10-K also excluded the same 5.4 million shares from Platinum's total ownership; it did so because Platinum was prevented by the Blocker from exercising the Warrant and acquiring the shares. App'x 563–64.

So as far as Navidea's SEC filings indicate, neither Goldberg nor Platinum was the beneficial owner of the shares. However, Navidea flatly stated that Goldberg did not in fact own them.

[4] Because Goldberg was a Navidea director, Item 403(b) of Regulation S-K required Navidea to disclose the amount and nature of the Navidea equity securities beneficially owned by him. *See* 17 C.F.R. § 229.403(b). Separately, Section 16(a) required Goldberg himself, as a director, to report his beneficial ownership of Navidea equity securities and changes in that ownership. *See* 15 U.S.C. § 78p(a)(1)–(3); 17 C.F.R. § 240.16a-3(a), (g).

On May 17, 2016, Goldberg wrote that he had not authorized the exchange of the preferred shares for warrants, notwithstanding his participation in the Navidea Board meeting at which the exchange occurred. He proposed that Platinum exercise the warrants and transfer the resulting common shares to his account. App'x 547. In other words, on May 17, 2016, Goldberg indicated that Platinum, not he, owned and had the right to exercise the PPVA Warrant. This was consistent with Navidea's recently filed Form 10-K, which did not credit Goldberg with ownership of the securities underlying the Warrant.

Goldberg's May 17, 2016 message was also consistent with his own pre-liquidation Section 16 filings. A Form 4 filed on Goldberg's behalf on April 29, 2016, reported that, following the transaction disclosed in that filing, he beneficially owned 359,572 Navidea common shares. Adv. Dkt. No. 166-4 (PX-010). A second Form 4, filed on July 7, 2016, reported that he beneficially owned just 403,152 common shares. Adv. Dkt. No. 166-5 (PX-011). Neither filing disclosed any interest in the PPVA Warrant or the 5,411,850 common shares underlying it. Both Forms reported common stock in Table I but left blank Table II, which is designated for "Derivative Securities Acquired, Disposed of, or Beneficially Owned," including warrants. *See also* App'x 946–48. Until the eve of the liquidation filing, Goldberg was not claiming any ownership, beneficial or otherwise, in the PPVA Warrant or the underlying Navidea common stock.

Nonetheless, in his reply to Goldberg's May 17 proposal that PPVA exercise the Warrant and transfer the shares to him, Joseph SanFilippo, Platinum's Chief Financial Officer, responded: "You were given Series B Preferred which were later exchanged for warrants. You now hold warrants. This is a fact." App'x 548. SanFilippo also asked Goldberg to confirm that he would exchange the "5,411,850 warrants that you currently own" for 5,350,254 common shares, with the

difference accounting for the one-cent-per-share exercise price. App'x 549.[5] SanFilippo's statements were inconsistent with Goldberg's proposal, Navidea's Form 10-K, PPVA's own audited financial statements, the Securities Exchange Agreement's representation that PPVA owned the preferred shares, and the Warrant's identification of PPVA as its holder. They were, however, consistent with the position taken by PPVA and Platinum in their most recent Schedule 13D.

Goldberg now maintains that his failure to disclose the Warrant or the underlying shares in his own SEC filings is not inconsistent with his present claim of ownership because the preferred shares had by then been exchanged for the Warrant and cancelled, the Warrant carried no voting rights, and the Warrant was subject to the beneficial-ownership Blocker. App'x 471. But that explanation is difficult to reconcile with Section 16 reporting rules. Goldberg was subject to Section 16(a) because he was a Navidea director – irrespective of whether the Warrant itself carried voting rights. *See* 15 U.S.C. § 78p(a)(1). Section 16(a) ordinarily requires a change in beneficial ownership to be reported within two business days, *see* 15 U.S.C. § 78p(a)(2)(C), and the SEC's implementing rules provide that "Statements of changes in beneficial ownership required by that section shall be filed on Form 4," 17 C.F.R. § 240.16a-3(a); *see also* 17 C.F.R. § 240.16a-3(g)(1). For purposes of reporting holdings and transactions under Section 16, beneficial ownership turns on a direct or indirect pecuniary interest, which expressly includes "[a] person's right to acquire equity securities through the exercise or conversion of any derivative security, whether or not presently exercisable," and a warrant is a derivative security. 17 C.F.R. § 240.16a-1(a)(2)(ii)(F), (c). Thus, if Goldberg had acquired the PPVA Warrant – or a pecuniary interest in it – as he now claims, he would have been required to report that acquisition. The fact that the Warrant had not

[5] No such exchange occurred.

yet been exercised would not have eliminated that obligation. And, of course, the Blocker did not apply to him, since he did not own anything close to 9.99% of Navidea's common stock.

But Goldberg filed no such report prior to the commencement of the liquidation. Instead, on October 19, 2016, Goldberg filed a Form 4 expressly reporting that he had acquired the Warrant on October 17, 2016 – nearly two months after the Cayman liquidation commenced. App'x 447–48. At trial, Goldberg acknowledged that he was unaware of any Form 4 filed before October 19, 2016, that disclosed an interest in either the PPVA Warrant or the preferred shares exchanged for it. App'x 949–51. The conclusion is inescapable that Goldberg did not believe, prior to the commencement of liquidation, that he beneficially owned either the Warrant or the underlying shares it represented – or, if he believed it, he failed to report it to the SEC, consistent with his obligation to do so.

### D. The Cayman Liquidation and the October 2016 Reissuance

On August 23, 2016, PPVA, acting through Platinum as its general partner, presented a voluntary winding-up petition to the Financial Services Division of the Grand Court of the Cayman Islands. App'x 360–76. The petition represented that PPVA was insolvent and unable to pay its debts. App'x 361. On August 25, 2016, the Cayman court placed PPVA into provisional liquidation and appointed joint provisional liquidators. App'x 377–82. On October 27, 2016, the Cayman court converted the provisional liquidation into an official liquidation. App'x 64–65, 383–400.

The bankruptcy court later relied on §§ 99 and 100(2) of the Cayman Islands Companies Act (2016 Revision). App'x 67. Section 99 provided that, once a winding-up order had been entered, "any disposition of the company's property and any transfer of shares or alteration in the status of the company's members made after the commencement of the winding up is, unless the

Court otherwise orders, void." *Id.* Section 100(2) provided that the winding up was deemed to commence when the winding-up petition was presented. *Id.* Accordingly, once the Cayman court entered the winding-up order, § 99 rendered void, absent approval from that court, any disposition of PPVA's property made after August 23, 2016.

Although any completed post-petition disposition would thus be void, Goldberg and certain Platinum personnel continued working to transfer or exercise the PPVA Warrant after the August 23, 2016 petition date. In September 2016, Goldberg and Platinum personnel were still working to establish an account subject to the controls contemplated by the Term Sheets. App'x 75–76. As of September 15, no control agreement had been executed. App'x 76. The record contains no separately executed Securities Loan Note and no payment by Goldberg to PPVA under such a note before or after the petition date. App'x 77–78.

In early October, Navidea advised the parties that Platinum could not exercise the PPVA Warrant without violating the previously defined Blocker. App'x 553. Goldberg proposed that Platinum instead transfer the Warrant to him so that he could exercise it. *Id.* On October 11, 2016, Goldberg asked Mark Nordlicht to execute and submit the Warrant's assignment form to Navidea. App'x 557–58. Goldberg acknowledged in a related communication that, because of the liquidation, "no one at Platinum can transfer the shares committed to me in December 2013." App'x 75.

On October 14, 2016, Nordlicht asked Goldberg to resend the assignment form without a date or with a different date because the October 2016 date appearing on the form was, in Nordlicht's view, inaccurate. App'x 556. Nordlicht asserted that Goldberg had been owed the securities as of October 1, 2015, "when we did the exchange with [the Tel Aviv Stock

Exchange].”[6] *Id.* The Securities Exchange Agreement, however, was executed on August 20, 2015 – not October 1. App’x 401. Goldberg replied: “Here it is put in whatever date you want.” App’x 556.

On October 16, 2016, Nordlicht completed and sent to Navidea an assignment form executed on a copy of the PPVA Warrant – not the wet signed original. This copy of the Warrant indicated that the Warrant had been assigned to Goldberg on October 1, 2015. App’x 65, 184–85, 227. The original executed Warrant was not surrendered to Navidea; it remained in PPVA’s BNY Mellon vault. *Id.* On October 17, a Navidea representative asked why the form had been dated October 1, 2015 and requested another form bearing a current date. Later that day, however, Navidea advised that it would accept the backdated assignment form that Nordlicht had sent on October 16. App’x 184–85, 227. Navidea then issued a replacement Warrant in Goldberg’s name on October 17, 2016. App’x 65, 431–46.

[6] Nordlicht was apparently referring to the exchange undertaken in connection with Navidea’s anticipated listing on the Tel Aviv Stock Exchange, which did not permit the company to maintain multiple classes of issued shares. It was to comply with this restriction that PPVA (not Goldberg) was asked to surrender the 1,655 Series B preferred shares in exchange for the PPVA Warrant. App’x 175, 401–16.

The Warrant’s 9.99% beneficial-ownership limitation later prevented PPVA from exercising the Warrant for all of the underlying common shares unless the holder first gave Navidea sixty-one days’ notice of its waiver of the limitation. App’x 422–23. In early October 2016 – after PPVA had filed its August 23 winding-up petition and had been placed into provisional liquidation on August 25 – Navidea advised the parties that PPVA could not exercise the Warrant without exceeding the Blocker. Goldberg then proposed that PPVA transfer the Warrant to him so that he could exercise it, App’x 377–82, 553 – which helps explain why the parties pursued a transfer of the Warrant in October 2016 rather than having PPVA exercise it.

Neither the TASE-related exchange nor the Blocker bears on ownership. The Warrant was issued to PPVA, and the Blocker restricted its exercise according to the particular holder’s aggregate ownership of Navidea common stock. It neither transferred the Warrant to Goldberg nor prevented PPVA from owning it.

### E. The Chapter 15 Proceeding and Goldberg's Subsequent Disclosure and Exercise of the Warrant

PPVA commenced a Chapter 15 proceeding in the United States Bankruptcy Court for the Southern District of New York on October 18, 2016. Ch. 15 Dkt. No. 1; App'x 13–53. The Chapter 15 petition was therefore filed one day after Navidea reissued the Warrant in Goldberg's name and one day before Goldberg's first SEC filing disclosing his acquisition of it.

On October 19, 2016, Goldberg filed a Form 4 reporting that, on October 17, 2016, he had acquired warrants exercisable for 5,411,850 shares of Navidea common stock. App'x 447–48. The explanatory note stated: "Warrants acquired from Platinum Partners Value Arbitrage Fund pursuant to a Separation Agreement, dated March 28, 2014, and amended on June 11, 2015." App'x 448. Unlike the April and July Forms 4, the October 19 filing expressly identified the Warrant and its 5,411,850 underlying shares, and reported that the date of acquisition was October 17, 2016 – not the October 1, 2015 backdated date that had been placed on the assignment form. App'x 447–48, 946–51.

On November 23, 2016, the bankruptcy court for this district recognized the Cayman liquidation as a foreign main proceeding, recognized the liquidators as PPVA's foreign representatives, and enjoined acts to obtain, transfer, or exercise control over PPVA's property. Ch. 15 Dkt. No. 27; App'x 54–59.

After entry of that order, Goldberg signed a cash-exercise form dated January 16, 2017 and paid Navidea the $54,118.50 exercise price for the 5,411,850 underlying shares. App'x 449–50.

Navidea's February 8, 2017 proxy statement, signed by Goldberg as Navidea's President and Chief Executive Officer, broadly stated that Goldberg and Platinum were "presently in the process of effectuating the transfer of ownership" of the securities covered by the separation arrangement. App'x 766. As to the PPVA Warrant specifically, the proxy stated that "on October

17, 2016, Platinum transferred warrants to acquire an aggregate of 5,411,850 shares" to Goldberg and that Goldberg exercised those warrants in full on January 17, 2017. *Id.* Thus, Goldberg's own signed filing placed the purported transfer well after the commencement of the Cayman Islands liquidation proceeding.

### F. The Adversary Proceeding

The liquidators learned of the purported transfer and exercise of the Warrant through Navidea's public filings. They demanded the proceeds from Goldberg, who rejected that demand. App'x 5–7.

On October 5, 2018, PPVA commenced this adversary proceeding. Adv. Dkt. No. 1; App'x 1–12. The complaint asserted claims for turnover under 11 U.S.C. §§ 542 and 1521, conversion, unjust enrichment, and contempt. App'x 7–11.

PPVA moved for summary judgment in January 2020, and Goldberg cross-moved for summary judgment in March 2020. Adv. Dkt. Nos. 23, 30-1. Following briefing and oral argument, Bankruptcy Judge Shelley C. Chapman entered the Modified Bench Decision and Order on Cross-Motions for Summary Judgment on May 10, 2022. Adv. Dkt. No. 44; App'x 60–80.

The bankruptcy court held that the Notes and Segregated Account provisions were express conditions precedent to any obligation to transfer the preferred shares or the subsequently issued PPVA Warrant to Goldberg. App'x 69–74. It further concluded that execution of the Term Sheets did not itself constitute "an outright transfer of ownership" or impose "a direct, immediate obligation" on any Platinum entity to deliver the securities. App'x 74. The court therefore held that Goldberg "had no live legal right to the PPVA Warrant as of the commencement of the Cayman Liquidation" and that "the PPVA Warrant remained property of PPVA and . . . the purported assignment is void." App'x 78–79. It granted PPVA summary judgment on its turnover

claim, denied Goldberg's cross-motion, and reserved the amount of PPVA's recovery for trial. App'x 79–80.

Goldberg moved for reconsideration, which the bankruptcy court denied on July 11, 2022. App'x 103. He then sought leave to take an interlocutory appeal, a motion that my colleague, the Honorable Gregory H. Woods, denied on September 19, 2022. App'x 103–04.

In March 2023, Goldberg again sought modification of the summary-judgment ruling, relying on a 2018 report concerning Platinum Partners Value Arbitrage Fund (USA) L.P., the onshore feeder fund. Adv. Dkt. Nos. 65, 65-1. On January 31, 2024, Bankruptcy Judge John P. Mastando III denied that motion, concluding both that Goldberg had not shown that the report qualified as "newly discovered" evidence and that the report concerned an entity distinct from PPVA – one that was neither a party to the Term Sheets nor the owner of the PPVA Warrant. Adv. Dkt. No. 96; App'x 81–95.

### G. The Damages Trial and Judgment

Following the summary-judgment ruling, the amount of PPVA's recovery on its turnover claim was the only issue remaining for trial. *See* App'x 96. Judge Mastando conducted a bench trial on damages on November 19 and 20, 2024. App'x 844–1328.

PPVA's valuation expert, Steven Napier, valued the PPVA Warrant as of October 17, 2016 – the date on which Navidea reissued it in Goldberg's name. App'x 105–06. Napier began with the market value of the 5,411,850 underlying Navidea shares, subtracted the one-cent-per-share exercise price, and applied a discount for lack of marketability. *Id.* He ultimately valued the Warrant at $4,069,186.06. App'x 106.

SanFilippo testified that he understood the Term Sheets to give Goldberg a portion of the positions he had managed in exchange for a note secured by those positions. App'x 107. He

further testified that, under his understanding of the agreements, neither Platinum nor PPVA could sell the PPVA Warrant without Goldberg's approval. *Id.* SanFilippo qualified that testimony by explaining that his understanding was that of an accountant, not a lawyer. *Id.*

Goldberg testified that the Warrant had no value to PPVA because the Term Sheets and public filings gave him sole dispositive authority and because no buyer would purchase a warrant that PPVA lacked authority to sell. App'x 108–10. Goldberg also testified as a nonretained valuation expert, and his written report was admitted without objection. App'x 848. His zero-dollar valuation rested principally on his view that PPVA did not possess the legal authority to sell the Warrant. He also criticized Napier's treatment of Navidea's financial condition, the size of the block of underlying shares, and the restrictions affecting their marketability, but he did not offer an alternative positive valuation incorporating those considerations. App'x 108–10.

On September 30, 2025, Judge Mastando issued a Memorandum Opinion and Order Awarding Damages. Adv. Dkt. No. 143; App'x 96–129. The court concluded that its summary-judgment ruling had already determined the full extent of PPVA's interest in the Warrant and rejected Goldberg's contention that his asserted dispositive authority survived independently of his right to receive the Warrant. App'x 112–15. It held that PPVA could have sold the Warrant without Goldberg's permission and that the Term Sheets did not diminish its value. App'x 115.

The court awarded PPVA $4,069,186.06 in turnover damages and $3,052,224.00 in prejudgment interest. App'x 98, 119–24. It denied both parties' requests for attorneys' fees and denied PPVA's request for punitive damages. App'x 98, 124–29. Judgment was entered accordingly, and Goldberg timely appealed. App'x 130–32.

## II. STANDARD OF REVIEW

On an appeal from a bankruptcy court, the district court reviews the bankruptcy court's conclusions of law *de novo* and its findings of fact for clear error. *In re Ames Department Stores, Inc.*, 582 F.3d 422, 426 (2d Cir. 2009). A grant of summary judgment is reviewed *de novo*, with all reasonable factual inferences drawn in favor of the nonmoving party. *In re Lehman Brothers Holdings Inc.*, 526 B.R. 481, 492 (S.D.N.Y. 2014), *aff'd*, 645 F. App'x 6 (2d Cir. 2016). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* Fed. R. Bankr. P. 7056.

The interpretation of an unambiguous contract, as well as the threshold question whether a contract is ambiguous, presents a question of law. *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010). In answering that question, the Court reads the disputed provisions "in the context of the entire agreement." *Id.* at 467. A written agreement that is complete, clear, and unambiguous must be enforced according to the plain meaning of its terms, without resort to extrinsic evidence. *Id.* at 467–68.

The bankruptcy court's factual findings following the damages trial – including its findings concerning valuation and the weight and credibility of the evidence – are reviewed for clear error; its legal conclusions are reviewed *de novo*. *See In re Ames Department Stores*, 582 F.3d at 426. A factual finding is clearly erroneous only when the reviewing court is left with the "definite and firm conviction that a mistake has been made." *Id.*

## III. DISCUSSION

### A. Execution of the Term Sheets Did Not Transfer Ownership of the Securities to Goldberg

Because review of the summary-judgment ruling is *de novo*, this Court may affirm "on any basis for which there is a record sufficient to permit conclusions of law," including on a ground

not relied upon by the bankruptcy court. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993); *see also In re Lehman Bros. Holdings Inc.*, 548 B.R. 663, 668 (S.D.N.Y. 2016).

The bankruptcy court characterized the Notes and controlled-account provisions as express conditions precedent to any transfer of the securities. App'x 69–78. If that characterization is correct, the judgment should be affirmed for the reasons stated by the bankruptcy court.

However, this Court need not decide this complicated question of New York law, because Goldberg loses even if these provisions were simply reciprocal promises rather than express conditions precedent. Goldberg may well be right that the Term Sheet sets out promises rather than conditions precedent. But he is dead wrong about what follows from that premise. A binding promise to transfer securities in exchange for consideration does not in and of itself cause the securities to be transferred. The Term Sheets obligated the parties to complete a future reciprocal exchange; execution of the contract did not effectuate that exchange. The judgment can therefore be affirmed under ordinary New York contract principles governing reciprocal promises and future performance.

The Original Term Sheet is unambiguous. Although the Amended Term Sheet modified certain economic terms of the parties' agreement, it left unchanged the provisions relevant to ownership of the Transferred Securities – namely the requirement that Goldberg issue Notes in consideration for the Transferred Securities, the provision giving him voting and dispositive power, and the requirement that the securities be placed in controlled accounts securing the Notes. App'x 336, 338–39. The Court focuses on that language, which appears in both Term Sheets.

1. <u>The Term Sheet Contemplated a Reciprocal, Seller-Financed Transfer</u>

The fundamental rule of contract interpretation is that agreements are construed in accordance with the parties' intent. *See, e.g.*, *Slatt v. Slatt*, 64 N.Y.2d 966, 967 (1985). "The best

evidence of what parties to a written agreement intend is what they say in their writing." *Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.*, 951 N.Y.S.2d 19, 24 (2012) (citation omitted). Under New York law, a complete and unambiguous written agreement must be enforced according to the plain meaning of its terms, read in the context of the agreement as a whole. *Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 222 (2d Cir. 2019); *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467–68 (2d Cir. 2010). Particular words must be considered "not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998) (citation omitted). The Court thus begins with the language and structure of the Term Sheet.

The Term Sheet expressly states that it is "legally binding" notwithstanding the parties' contemplation of later definitive documentation. App'x 328, 336. But the fact that the Term Sheet created binding contractual obligations does not answer the question whether execution of the document conveyed the securities. Those are two separate questions.

The Second Circuit's decision in *Vacold LLC v. Cerami*, 545 F.3d 114 (2d Cir. 2008) illustrates the distinction. There, an April 9 letter agreement bound the parties to a stock transaction, even though the formal stock-purchase agreement was not executed and "the stock transfer" did not occur until the June 1 closing. *Vacold*, 545 F.3d at 119, 123–30. *Vacold* thus distinguishes the parties' binding commitment to complete a stock transaction from the subsequent closing through which the contemplated exchange was performed. *See id.* The same distinction applies here. The Term Sheets bound the parties to carry out the transaction they described; they did not themselves carry it out.

Under New York law, "No particular words are necessary to effect an assignment; it is only required that there be a perfected transaction between the assignor and assignee, intended by those parties to vest in the assignee a present right in the things assigned." *Leon v. Martinez*, 84 N.Y.2d 83, 88 (1994). Thus, an instrument stating "I now give you" an interest, or that the assignee presently "is entitled to" an interest, can effect a present assignment. But a promise to provide the interest in the future does not. *Id.* at 88–89; *see also Whalen v. Gerzof*, 615 N.Y.S.2d 465, 467 (3d Dep't 1994) ("No special language or form is required for an assignment, so long as the intention to effect a present transfer is apparent." (citing 6 N.Y. Jur.2d, Assignments, § 28)).

The relevant authorities consistently distinguish language manifesting a present transfer from language promising or directing future performance. *Compare Banque Arabe et Internationale d'Investissement v. Maryland National Bank*, 57 F.3d 146, 151–53 (2d Cir. 1995) (assignment of "all" rights, title, and interest), *Stathos v. Murphy*, 26 A.D.2d 500, 503–04, 276 N.Y.S.2d 727, 730–31 (1st Dep't 1966) ("grant, assign and convey"), *aff'd,* 19 N.Y.2d 883 (1967), and *Grymes v. Hone*, 49 N.Y. 17, 19, 22–23 (1872) ("absolute assignment in writing"), with *Coastal Commercial Corp. v. Samuel Kosoff & Sons, Inc.*, 199 N.Y.S.2d 852, 855–56 (4th Dep't 1960) (direction concerning future payment did not effect an assignment), *Miller v. Wells Fargo Bank International Corp.*, 540 F.2d 548, 557–59 (2d Cir. 1976) (revocable payment instructions did not presently assign the fund), and *Addison v. Enoch*, 48 A.D. 111, 112–14, 62 N.Y.S. 613, 614–15 (1st Dep't 1900) (promise of future payment from a designated fund was not an assignment), *aff'd*, 168 N.Y. 658 (1901).

Here, the Term Sheets contain no language manifesting a present assignment of ownership of the Transferred Securities. They do not say that the Platinum Funds "hereby transfer," "hereby assign," or otherwise presently convey the securities to Goldberg. Instead, Platinum stated that it

"*wishes*, subject to the terms and conditions described herein, *to cause*" various unidentified Platinum Funds "to transfer" the identified securities to Goldberg. App'x 328, 336–37 (emphasis added). This language describes a transfer to be made later, pursuant to the Term Sheets, by funds that had not yet been identified. It does not state that the transfer would occur automatically upon execution of the Term Sheets.

Moreover, the phrase "subject to the terms and conditions described herein" is not surplusage. It confirms that the contemplated transfer was not unconditional or self-executing, but was instead one component of a transaction that imposed interdependent obligations on both sides. Whether every such obligation qualifies as an express condition precedent is beside the point. The Term Sheets plainly imposed conditions governing each side's performance under their agreement. The language is entirely unambiguous and admits of only one reasonable interpretation: Platinum bound itself to cause certain affiliated funds – which it had not yet identified at the time the Term Sheets were executed – to transfer securities to Goldberg once they were identified (*i.e.*, at some later date) as part of a reciprocal exchange for which Goldberg would provide consideration. Therefore, the quoted provision from the Term Sheet uses the language of future performance and did not itself effect that transfer. *See Vacold*, 545 F.3d at 119, 123–30; *Miller*, 540 F.2d at 557–59.

The provision governing Goldberg's corresponding performance under the contract reinforces that conclusion:

> *In consideration for the Transferred Securities*, Dr. Goldberg *shall issue* to one or more of the Platinum Funds, as directed by Platinum . . . seven year notes . . . .

App'x 338 (emphasis added); *see also* App'x 329. The Notes were to equal the agreed value of the securities, accrue interest at two percent annually, and be payable to one or more Platinum

Funds, as Platinum directed. App'x 329, 338. Proceeds, dividends, and distributions generated by the securities were to be applied toward the outstanding principal and interest on the Notes. *Id.*

The Notes were the purchase-price instruments through which Goldberg was to pay for the securities. The Term Sheets say so expressly. They do not provide that, upon execution, Goldberg "shall be deemed to have issued" the Notes; they provide that he "shall issue" them "in consideration for" the Transferred Securities. App'x 329, 338. If something "shall issue" then it still has to be issued. "Shall issue" contemplates future issuance as part of a bilateral exchange of promises.

Nor could the Term Sheets themselves have constituted the contemplated Notes, as Goldberg now argues. Goldberg was required to issue the Notes to "one or more of the Platinum Funds, as directed by Platinum." *Id.* The Term Sheets do not identify the Fund or Funds to which the Notes were to be made payable. Neither do the Term Sheets allocate the principal amount of the Notes among those unidentified Funds. Since the Term Sheets neither identify the payee(s) nor specify the amount of any Note(s) that might issue, they cannot possibly be the "Notes" contemplated by the parties in their contract. Goldberg's contention that they are is completely untenable where, as here, the most fundamental terms of the "Notes" remained to be designated.

The controlled-account provisions are an integral part of the same transaction. The Term Sheets provide that the Transferred Securities "shall be deposited" into brokerage accounts owned by Goldberg, each subject to a Securities Account Control Agreement in favor of Platinum or its affiliates. App'x 330, 339. The parties intended that Platinum or its affiliates obtain "a first priority, perfected security interest" in the accounts, and the designated Noteholders were to obtain the waivers and consents required "to transfer the Transferred Securities into the Accounts." *Id.* Goldberg was required to cooperate in that process. The future-oriented language of these

provisions confirms that the contemplated conveyance and financing structure had not already been implemented when the Term Sheet was executed.

Read together, these provisions describe a seller-financed exchange. Goldberg would issue the Notes and the Funds designated by Platinum would sell the identified securities to him – a transaction that would necessarily reflected in the transferring Funds' books and records. The Funds would then deposit the securities into accounts owned by Goldberg, but Platinum or its affiliates would hold perfected security interests in the Transferred Securities in order to secure Goldberg's obligation to make the payments due under the Notes.

Platinum's obligation to "cause" its affiliates to transfer the securities was expressly subject to "the terms and conditions" set out in the Term Sheets. Or, as Goldberg himself put it: "They were required to do A, B, C and D. I was required to do X, Y and Z." App'x 572–73. Nothing in the Term Sheets suggests that title to the securities would pass independently of the rest of the deal – or that it passed automatically just because Goldberg and Platinum signed the contract.

New York stock-sale cases distinguish the contract creating the obligation to buy and sell from the later exchange through which the purchase price and securities are delivered. *See Agar v. Orda*, 264 N.Y. 248, 249–53 (1934); *Waddle v. Cabana*, 220 N.Y. 18, 23–27 (1917). In *Waddle*, for example, the agreement contemplated a promissory note for the purchase price and the seller's retention of the stock as collateral, while the Court of Appeals separately addressed the point at which "the stock certificates are actually transferred" in performance of the contract. 220 N.Y. at 23, 27. Here, the Term Sheet expressly identifies issuance of the Notes as the consideration for the Transferred Securities. App'x 329, 338.

The Term Sheet therefore created an enforceable obligation to complete a future reciprocal exchange – not a present conveyance of the securities.

2. The Contemplated Transaction Never Closed

The Term Sheets do not prescribe dates for the performance of the parties' respective obligations. Nor do they state that either side was required to perform unconditionally before the other tendered the corresponding performance. Under New York law, obligations capable of being performed simultaneously are due concurrently. Restatement (Second) of Contracts § 234(1) (1981). And "Where the agreement contains concurrent conditions, it is a condition of each party's duties that the other party either render performance or, with manifested present ability to do so, offer performance of his part of the exchange." *Schober v. Hudson Valley Humane Society for Prevention of Cruelty to Animals, Inc.*, 933 N.Y.S.2d 58, 60 (2d Dep't 2011) (citing Restatement (Second) of Contracts § 238).

Accordingly, neither party was required to surrender its side of the exchange unless the other rendered – or, with the present ability to do so, offered to render – the reciprocal performance to which it was entitled.

The undisputed record establishes that Goldberg never issued a separate Securities Loan Note to any Platinum entity. When asked whether he had issued such a Note, Goldberg answered, "I don't believe so, no." App'x 572. He also admitted that he did not issue a single Note in the $11,202,529 amount attributable to the Navidea preferred shares. App'x 574. And he identified no evidence that, before the Cayman liquidation commenced, he tendered or offered to deliver executed Notes to the appropriate Platinum Funds in exchange for their securities.

PPVA's audited financial statements likewise did not reflect a completed disposition of the Transferred Securities. Although the accompanying notes described the securities as "transferred," PPVA continued to carry them among its investments and recorded a corresponding liability of equal value. App'x 530–31. Thus, the securities remained on PPVA's balance sheet; they were not removed from its reported investments as assets that had been sold and delivered to Goldberg.

Finally, the contractually required controlled-account arrangement was not completed. No Securities Account Control Agreement was executed before the Cayman liquidation commenced; the parties were still communicating with Merrill Lynch about how to set up the necessary account controls in September 2016. App'x 75–76.

Thus, neither the consideration contemplated by the Term Sheets in exchange for the transfer of certain securities nor the agreed mechanism for actually transferring the securities into Goldberg's control was ever completed. Prior to the commencement of the Cayman Islands liquidation, Goldberg never did his "X, Y, or Z" – he neither tendered the Notes that constituted the consideration for the transfer of the securities nor created the controlled accounts into which the various Platinum entities could transfer the subject securities. It should, therefore, come as no surprise that the Platinum Entities did not do their "A, B, C, and D," either.

The Court need not characterize either party's nonperformance as a breach. Where each side's performance is to be exchanged concurrently, each may withhold performance until the other renders or offers its part of the exchange. *See* Restatement (Second) of Contracts § 238 & cmt. a. It is undisputed that neither side did anything to effectuate the deal. Platinum was not obligated to cause the Funds to transfer their securities without being offered the Notes that were to be issued to pay for them; and Goldberg acquired no right to insist upon the transfer of ownership while declining to tender the agreed consideration. The transaction was simply not consummated. It remained unconsummated at the moment the liquidation was commenced in the Cayman Islands. Therefore, at the relevant moment, PPVA still owned the "Transferred Securities."

3. <u>None of Goldberg's Arguments Establishes That Ownership Passed to Him</u>

To establish his ownership of the securities, Goldberg relies on the provision in the Term Sheets stating that he "shall have sole voting and dispositive power over the Transferred

Securities." App'x 329, 338. He contends that this language shows either that the securities were transferred when the Original Term Sheet was executed or, at the very least, that he immediately became their beneficial owner under Rule 13d-3(a) of the Exchange Act. *See* 17 C.F.R. § 240.13d-3(a). He also points to extrinsic evidence that he contends proves his ownership of the disputed shares.

None of these arguments is unconvincing.

*First,* the parties' use of the defined term "Transferred Securities" does not indicate that any transfer had already occurred. The Original Term Sheet defines "Transferred Securities" simply as the securities identified on the attached Schedule 1 – the securities that Platinum "*wishes*, subject to the terms and conditions described herein, *to cause* certain of the private investment funds under its management to transfer to Dr. Goldberg." App'x 328, 334 (emphasis added). "Transferred Securities" was therefore a convenient shorthand chosen by the parties to describe the securities covered by the contemplated transaction. Use of this defined term was not a declaration that title had already passed. Indeed, the very sentence that introduces the defined term "Transferred Securities" describes a future transfer – Platinum would "cause" its managed funds "to transfer" the securities – and makes that transfer "subject to the terms and conditions" imposed by the Term Sheets. *Id.*

Those terms and conditions imposed reciprocal obligations on both sides. As Goldberg himself put it: "They were required to do A, B, C and D. I was required to do X, Y and Z." App'x 572–73. The defined term says nothing about when those obligations were to be performed, much less that ownership passed before either side performed them. Because the reciprocal exchange contemplated by the Term Sheets never occurred on either side, the mere fact that the parties used

the phrase "Transferred Securities" to describe the shares that were the subject of their contract does not establish that Goldberg acquired ownership before the Cayman liquidation commenced.

Goldberg next argues that the voting-and-dispositive-power provision made him the beneficial owner of the securities pursuant to Rule 13d-3(a). Unfortunately for Goldberg, "beneficial ownership" under Rule 13d-3 is a specialized federal disclosure concept; it is not synonymous with ownership of property under state law. It is the latter inquiry – whether Goldberg acquired a property interest in the Warrant – that controls here.

Rule 13d-3 provides, "For the purposes of sections 13(d) and 13(g) of the Act," that a person is a beneficial owner if, "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise," he has or shares voting or investment power over a security. 17 C.F.R. § 240.13d-3(a). Because the Term Sheets state that Goldberg "shall have sole voting and dispositive power over the Transferred Securities," he contends that he acquired beneficial ownership immediately upon execution, regardless of who retained legal title. His argument confuses a specialized federal reporting concept with state-law property and contract analysis.

Congress enacted Section 13(d), which was added to the Exchange Act by the Williams Act, Pub. L. No. 90–439, 82 Stat. 454 (1968) (codified as amended at 15 U.S.C. §§ 78m(d)-(g), 78n(d), (f)), to "alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control." *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971). Consistent with that disclosure purpose, "Rule 13d-3 defines beneficial ownership not by pecuniary interest in a security but rather by reference to the power to vote or dispose of that security." *Rubenstein v. International Value Advisers, LLC*, 959 F.3d 541, 548 (2d Cir. 2020). For purposes of the federal reporting rule, legal

title is not dispositive of beneficial ownership – and vice versa. A person may be deemed a beneficial owner for disclosure purposes even though he does not own the securities in which he has a beneficial interest. *See GAF Corp.*, 453 F.2d at 715–16 (explaining that Section 13(d) implicates not "the relatively simple concept of legal title," but "the amorphous and occasionally obfuscated concepts of indirect and beneficial ownership"); *CSX Corp. v. Children's Investment Fund Management (UK) LLP*, 654 F.3d 276, 279–80 (2d Cir. 2011) (distinguishing shares "owned outright" from "whatever beneficial ownership, if any," arose through contractual arrangements and explaining that the contracts at issue "do not transfer title to the underlying assets").

The distinction between beneficial ownership and legal title extends beyond the federal securities-disclosure rules. In ordinary property-law usage, a "beneficial owner" possesses the benefits of ownership but without holding legal title. *See Beneficial Owner*, Black's Law Dictionary 1337 (12th ed. 2024); *see also In re PCH Assocs.*, 949 F.2d 585, 603 (2d Cir. 1991) (distinguishing beneficial ownership from "mere legal title"). More specifically, Black's Law Dictionary defines a "beneficial holder of securities" as "[a] holder of equitable title to corporate stock," explaining that, "The stock is not registered under the holder's name in the corporation's records." *Beneficial Holder of Securities*, Black's Law Dictionary (12th ed. 2024). And equitable title is, "A title that indicates a beneficial interest in property and that gives the holder *the right to acquire* formal legal title." *Equitable Title*, Black's Law Dictionary 1803 (12th ed. 2024) (emphasis added). Thus, whether under the federal reporting rules or ordinary property-law principles, beneficial ownership does not itself establish that legal title has passed. It is, rather, consistent with what all parties acknowledged – Goldberg has the "right to acquire" formal legal title to the securities.

It follows that classification as a beneficial owner under a federal disclosure rule does not, without more, establish that legal title to the security passed under state contract law. The "basic federal rule in bankruptcy is that *state law governs the substance of claims*, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450–51 (2007) (citation modified). The dispositive question is therefore not whether federal securities regulations might have required Goldberg to report some form of beneficial ownership. It is whether, under New York law and the terms of the parties' contract, Goldberg acquired an ownership interest in the Warrant or its underlying shares before the liquidation commenced.

To the extent the parties – and, at points, the Bankruptcy Court – used "beneficial ownership" as a shorthand for ownership of the Warrant itself, they obscured the actual issue. And to the extent they treated Rule 13d-3 as being dispositive of legal ownership, a question of state law, they were barking up the wrong tree. Rule 13d-3 determines who must disclose voting or investment power for federal reporting purposes; it does not decide whether a contract conveyed title or any other property interest cognizable under state law. Indeed, "property interests are created and defined by state law, and unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Travelers Cas. & Sur. Co. of Am.*, 549 U.S. at 451 (citation modified). The answer therefore turns on the language of the Term Sheets, the reciprocal performance they required, the separate instruments and controlled-account protections they contemplated, and whether the parties completed the contemplated transfer of the Warrant. These

considerations – not the terminology employed in federal disclosure filings[7] – determine whether Goldberg acquired ownership of the Warrant before the Cayman liquidation commenced.

Even assuming, without deciding, that the voting provision caused Goldberg to be treated as a beneficial owner for federal reporting purposes before the securities were deposited into the controlled accounts – a position that cannot be reconciled with the disclosures that Goldberg and Navidea actually made to the SEC, *see supra* Section I(C) – that fact would establish neither that the execution of the Term Sheets conveyed an ownership interest in the securities to him nor that the integrated transaction contemplated by those agreements had been completed. As discussed above, Goldberg never issued or tendered the Notes constituting the agreed consideration, and the contemplated transfer mechanism was never completed. Beneficial-ownership status for purposes of Sections 13 and 16 and their implementing rules is no substitute for the contractual performance necessary to complete the transfer.

Finally, Goldberg's reliance on extrinsic evidence is hardly helpful to him, since his own admissions – especially in public filings made under penalty of perjury – contradict the position he takes in this lawsuit at every turn.

Because the Term Sheets are unambiguous, the extensive extrinsic evidence submitted by the parties cannot alter the meaning of the contractual language. Under New York law, "[e]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). Evidence "outside the four corners of the document" is "admissible only if a court finds an ambiguity in the contract," and is otherwise "inadmissible to alter or add a provision to a written

[7] Rule 13d-3 does not itself confer voting or dispositive power on anyone. It classifies a person who already "has or shares" that power by virtue of a contract, arrangement, relationship, or other source. 17 C.F.R. § 240.13d-3(a).

agreement." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013). Extrinsic evidence also may not "be considered in order to create an ambiguity in the agreement." *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990). The parties' subsequent characterizations about Goldberg's interest (or lack of interest) in the Transferred Securities do not create any ambiguity in the contract where, as here, the terms of the actual contract unambiguously manifest an intention to perform in the future – not a conveyance simultaneous with execution. As a result, the Court does not – indeed, cannot – rely on extrinsic evidence in reaching its conclusion.

However, the extrinsic evidence does not establish that Goldberg acquired the Warrant before the Cayman liquidation commenced, as he argues. To be sure, two PPVA documents – its April 2016 Schedule 13D and Rogers's July 2015 internal accounting memorandum – describe the 5,411,850 underlying shares as "owned by" Goldberg and state that he possessed sole voting and dispositive power over them. App'x 483, 543–45. But neither document memorialized a completed assignment of the PPVA Warrant to Goldberg. And because the Schedule 13D addressed beneficial ownership for purposes of federal securities reporting, its use of the words "owned by" are not determinative of whether ownership of the Warrant had passed to Goldberg under New York law.

But all the other extrinsic evidence – including every one of Goldberg's and Navidea's SEC filings – negate any suggestion that he acquired either the Warrant or the underlying shares that were issuable upon its exercise before the Cayman Islands liquidation commenced. As outlined extensively above, PPVA continued to carry the securities among its investments in its audited financial statements and represented that it was both the record and the beneficial owner of the Navidea Series B shares in order to exchange those shares (which were the subject of the Original Term Sheet) for the PPVA Warrant. In his April and July 2016 Forms 4, Goldberg did

not disclose beneficial ownership of either the PPVA Warrant or the 5,411,850 underlying shares to the SEC, which was required if he in fact owned them. App'x 946–51. Navidea's 2015 Form 10-K stated that Goldberg had only "*the right to acquire*" those shares from Platinum; it did not include those shares in its report of the shares beneficially owned by Goldberg as a Navidea director or a large shareholder. App'x 563–64. And Goldberg's October 19, 2016 Form 4 reported to the SEC that he acquired the Warrant on October 17, 2016 – nearly two months after the Cayman liquidation had commenced – while Navidea's February 2017 proxy statement likewise stated that the transfer occurred on October 17, 2016. App'x 447–48, 766.

The extrinsic evidence thus does not establish that the Warrant or any shares represented thereby were transferred to Goldberg before August 23, 2016 – much less overcome the unambiguous language of the Term Sheets.

4. <u>PPVA Did Not Waive the Notes and Controlled-Account Protections</u>

Next, Goldberg argues that PPVA's statements concerning his beneficial ownership constituted a waiver of its right to insist upon issuance of the Notes or completion of the controlled-account arrangements. The argument fails factually, and, even if it were correct as a matter of fact, it would not vest him with ownership of the shares as a matter of law.

Under New York law, waiver is the knowing, voluntary, and intentional abandonment of a contractual right. *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Management, L.P.*, 7 N.Y.3d 96, 104 (2006). Such abandonment "may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." *Id.* But waiver "should not be lightly presumed" and must rest on "a clear manifestation of intent" to relinquish the contractual protection. *Id.* It is "essentially a matter of intention," and "Negligence, oversight, or

thoughtlessness does not create it." *Alsens American Portland Cement Works v. Degnon Contracting Co.*, 222 N.Y. 34, 37 (1917).

The record contains no clear manifestation that PPVA or Platinum abandoned the Notes or controlled-account protections.

The Term Sheets required both that Goldberg issue Notes in consideration for the Transferred Securities and that the securities be deposited, as part of the same transaction, into controlled accounts so that the financing seller would have security for Goldberg's payment obligations. App'x 329–30, 338–39. PPVA's audited financial statements described the transaction as an exchange of securities for notes *receivable* (not received), stated that the Notes were to be collateralized by the transferred securities, and – most significantly – continued to include the "Transferred Securities" among PPVA's investments while reporting that PPVA retained custody of them. App'x 530–31. The financial statements thus reflected PPVA's continued ownership and possession of the securities, not an abandonment of its right to receive the consideration and security contemplated by the Term Sheets.

An internal memorandum prepared at Platinum in July 2015 likewise referred to the transaction as an exchange "for the note" and treated PPVA as owning "a note due from Dr. Goldberg." App'x 543–45. The author's premise was factually incorrect – it is undisputed that Goldberg had not issued any Note and never did – but it confirms that Platinum continued to regard a Note as the consideration PPVA was entitled to receive.

As late as September 2016, Platinum personnel were still attempting to establish the required account controls so that securities could be transferred to Goldberg; they insisted on retaining possession of the securities until those protections were in place. App'x 75–76. The

record therefore shows PPVA's continued reliance on both the Notes and the controlled-account protections, not a knowing and intentional abandonment of either.

Nor does PPVA's description of Goldberg as a beneficial owner in a federal securities filing establish waiver of those separate contractual protections. A statement about federal beneficial ownership is not a clear relinquishment of the right to receive the agreed purchase-price Notes or the bargained-for security interest. No filing, correspondence, or other document states unambiguously, or even suggests, that PPVA was willing to transfer title to the securities to Goldberg without those protections.

Meanwhile, PPVA's insistence that it was not the beneficial owner of the securities was completely consistent with the requirements of the Blocker, which prevented PPVA, absent sixty-one days' advance notice, from exercising the Warrant to the extent that exercise would cause it to beneficially own more than 9.99% of Navidea's outstanding common stock. The Blocker unquestionably impacted how PPVA treated the underlying shares for federal beneficial-ownership reporting purposes. But it did not prevent PPVA from owning the Warrant, did not transfer the Warrant to Goldberg, and did not relinquish PPVA's right to receive the Notes and obtain the controlled-account protections. As explained above, even an express disclaimer of beneficial ownership of the underlying shares was entirely compatible with PPVA's continued legal ownership of the Warrant and its continued insistence upon the contractual protections governing any eventual transfer to Goldberg.

Goldberg therefore cannot establish the knowing and intentional abandonment required by New York law.

In all events, waiver of those provisions would not establish that Goldberg had acquired title to the securities. Waiver relinquishes a right to insist upon contractual performance – nothing

more. It does not constitute an assignment or conveyance of property. *See Nassau Trust Co. v. Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 184 (1982); *Leon v. Martinez*, 84 N.Y.2d 83, 88–89 (1994). If Platinum had waived its right to receive the Notes and to have the shares placed in controlled accounts subject to security agreements (and it did not), Goldberg might at most have acquired the right to demand that the shares be transferred to him even though he had not satisfied the waived requirements. But a right to demand a transfer is not in and of itself a transfer. Therefore, no conveyance occurred before the Cayman liquidation commenced.

### B. The Purported Post-Liquidation Assignment Did Not Transfer the PPVA Warrant

The conclusion that PPVA owned the Warrant when the Cayman liquidation commenced resolves the legal effect of the purported October 2016 assignment. Because the Warrant remained PPVA's property on August 23, 2016, any subsequent assignment constituted a disposition of PPVA's property and was subject to Cayman law.

Section 99 of the Cayman Islands Companies Act provided:

> When a winding up order has been made, any disposition of the company's property and any transfer of shares or alteration in the status of the company's members made after the commencement of the winding up is, unless the Court otherwise orders, void.

Companies Act § 99 (2016 Revision); App'x 67. Section 100(2), in turn, provided that "the winding up of a company by the Court is deemed to commence at the time of the presentation of the petition for winding up." Companies Act § 100(2); App'x 67. Platinum, acting as PPVA's general partner, presented the winding-up petition on August 23, 2016. App'x 360–76. The Cayman court entered the winding-up order on October 27, 2016. App'x 383–400. Section 99 thus rendered void, absent an order of the Cayman court, any disposition of PPVA's property made after August 23, 2016.

The purported assignment occurred after August 23, 2016. On October 11, 2016, Goldberg asked Nordlicht to execute and submit the Warrant's assignment form to Navidea. App'x 557–58. Three days later, Nordlicht asked Goldberg to resend the form without a date or with a different date, asserting that the October 2016 date then appearing on it was inaccurate because Goldberg had been owed the securities as of October 1, 2015. App'x 556. Goldberg responded: "Here it is put in whatever date you want." *Id.* Nordlicht then executed an assignment form on a copy of the PPVA Warrant and dated it October 1, 2015. App'x 65. The original Warrant was not surrendered and remained in PPVA's custody at BNY Mellon. *Id.* Navidea nevertheless reissued the Warrant in Goldberg's name on October 17, 2016. App'x 65, 431–46.

The October 1, 2015 date inserted on the assignment form does not create a genuine dispute about when the purported disposition occurred. The form was indisputably requested, transmitted, and executed in October 2016. Nothing relevant to the Warrant occurred on October 1, 2015; PPVA had exchanged its preferred shares for the Warrant on August 20, 2015. App'x 401–16. Goldberg's own subsequent disclosures likewise identified October 17, 2016 as the date on which he acquired the Warrant. His October 19, 2016 Form 4 reported October 17 as the transaction date and described the Warrant as having been "acquired from" PPVA pursuant to the Term Sheets. App'x 447–48. Navidea's February 2017 proxy statement similarly stated that Platinum transferred the Warrant to Goldberg on October 17, 2016. App'x 766.

The undisputed chronology therefore places the purported disposition after the commencement of the winding up. Apparently, Goldberg was unwilling to lie to the SEC about when he acquired the Warrant – even though he was perfectly willing to execute a transfer document bearing a falsified date.

As explained in Section III(A), the Term Sheet did not itself convey the securities, and the contemplated reciprocal exchange was not completed before the liquidation commenced. An assignment form executed in October 2016 could not retroactively accomplish a transfer that had not previously occurred merely by reciting an earlier date. Backdating the document suggests nefarious behavior, but it did not cause the Warrant to be transferred a year earlier than it was.

The purported assignment also lacked the approval required by § 99. The record contains no evidence that the Liquidators approved the transfer or that the Cayman court entered an order authorizing it. *See* Adv. Dkt. No. 21 ¶¶ 9, 15–19. Indeed, by October 11, 2016, Goldberg understood that the liquidation had affected Platinum's authority. He wrote: "Speaking with David Steinberg[,] he tells me that given the situation with the liquidation of Platinum and the Cayman islands liquidator, no one at Platinum can transfer the shares committed to me in December 2013." App'x 75. Goldberg's own statement confirms that he understood that (1) the shares had only been "committed to me" when the Term Sheet was signed – not "conveyed to me" – and (2) Platinum personnel could not effect a then-current transfer without the involvement of the Liquidators or the Cayman Islands court.

Goldberg correctly observes that liquidation could not enlarge PPVA's preexisting property rights or extinguish an ownership interest that already belonged to him. As the Supreme Court has stated in the analogous domestic-bankruptcy context, "The estate cannot possess anything more than the debtor itself did outside bankruptcy." *Mission Product Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 381 (2019); *see also In re Howard's Appliance Corp.*, 874 F.2d 88, 93 (2d Cir. 1989). But that principle does not help Goldberg. PPVA entered liquidation owning the Warrant; Goldberg had not acquired title to it, and the underlying Navidea shares were not issued to him until January 2017. *See* App'x 449–50, 766. Section 99 therefore did not enlarge

PPVA's interest, as Goldberg contends, but operated as intended in voiding a later disposition of property that PPVA already owned.

Goldberg's contention that he could have issued the Notes or completed the controlled-account arrangement after the liquidation commenced likewise misses the point. *See* Dkt. No. 20 at 23. Even assuming that Goldberg remained free to tender the Notes and participate in completing the controlled-account arrangements after August 23, 2016, his belated performance would not be evidence that the reciprocal exchange contemplated by the contracting parties occurred prior to that date, or that title to the securities that were "committed to me" (but not "conveyed to me") had passed before the petition was presented. And once that petition was filed, any subsequent effort to complete the uncompleted transaction was subject to § 99 and required Cayman-court approval.

Because the purported October 2016 assignment was a disposition of PPVA's property made after the commencement of the winding up and without Cayman-court approval, it was void under § 99. The bankruptcy court correctly concluded that the assignment did not transfer the PPVA Warrant to Goldberg. App'x 78–79.

### C. PPVA Was Entitled to Turnover Relief

The bankruptcy court had clear statutory authority to grant the Liquidators turnover relief. Upon recognition of a foreign proceeding, § 1521(a) authorizes a bankruptcy court, where necessary to effectuate the purposes of Chapter 15 or protect the debtor's assets or creditors' interests, to "grant any appropriate relief." 11 U.S.C. § 1521(a). This relief expressly includes "entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative," *id.*, § 1521(a)(5), and "granting any

additional relief that may be available to a trustee," except for relief under specifically enumerated provisions not relevant here, *id.*, § 1521(a)(7).

Section 1521(a)(5) independently permits a court to place a foreign debtor's United States assets under the foreign representative's control. Administration or realization of those assets necessarily may require obtaining possession of property held by third parties. *See In re Atlas Shipping A/S*, 404 B.R. 726, 739–42 (Bankr. S.D.N.Y. 2009) ("Incident to the task of administering and realizing assets of the debtor within the U.S. is the need to obtain affirmative control over such assets." (citation omitted)).

Section 1521(a)(7) provides an additional source of authority. Section 542 is relief available to a domestic trustee and is not among the provisions excluded by § 1521(a)(7). A recognized foreign representative may therefore invoke the turnover remedy available under § 542, subject to the sufficient-protection requirement of § 1522. *See In re AJW Offshore, Ltd.*, 488 B.R. 551, 558–61 (Bankr. E.D.N.Y. 2013); *see also In re Markus*, 610 B.R. 64, 76, 84 (Bankr. S.D.N.Y. 2019), *aff'd*, 620 B.R. 31 (S.D.N.Y. 2020).

Chapter 15 does not itself create a domestic bankruptcy estate under § 541. Its provisions accordingly refer to "the debtor's assets" or "property of the debtor," rather than property of a newly created estate. *See In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016). The relevant question here is therefore whether the Warrant belonged to PPVA and was an asset within the territorial jurisdiction of the United States that the Liquidators could administer or realize – not whether it entered a separately created Chapter 15 estate. The bankruptcy court recognized the Cayman liquidation as a foreign main proceeding and the Liquidators as PPVA's foreign representatives on November 23, 2016. Ch. 15 Dkt. No. 27; App'x

54–59. Sections 1521(a)(5) and (a)(7) consequently authorized them to seek control of PPVA's Warrant or its value. *In re Markus*, 610 B.R. at 76.

Section 542(a) provides the applicable turnover framework. It requires an entity that possessed, held, or controlled during the case property that a trustee could use, sell, or lease to deliver the property – or its value – unless the property is of inconsequential value or benefit. 11 U.S.C. § 542(a). Turnover is one of the principal mechanisms by which a bankruptcy court collects property belonging to the debtor for administration. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205–07 (1983). It operates as "a right to recover the estate's property in kind," with the value of the property available as a substitute when return in kind is no longer possible. *In re Pali Holdings, Inc.*, 488 B.R. 841, 849 (Bankr. S.D.N.Y. 2013). The party seeking turnover bears the burden of establishing by a preponderance of the evidence that the property belonged to the debtor and otherwise satisfies the statutory requirements. *In re Kaspar*, 667 B.R. 195, 220 (Bankr. S.D.N.Y. 2025); *LaMonica v. CEVA Group PLC (In re CIL Ltd.)*, No. 13-11272 (JLG), 2024 WL 1693626, at *45 (Bankr. S.D.N.Y. Apr. 18, 2024).

These requirements were met here. Goldberg obtained a replacement Warrant in his name on October 17, 2016. App'x 431–46. After the Chapter 15 recognition order was entered, he exercised it and received 5,411,850 shares of Navidea common stock. App'x 449–50, 766. Thus, the Warrant, the rights represented by it, or the resulting shares were within Goldberg's possession, custody, or control during the Chapter 15 case. There is likewise no genuine contention that the Warrant was of merely inconsequential value. Goldberg disputes its precise value, but that issue concerns the measure of recovery, not the availability of turnover relief. Goldberg only meaningfully contests PPVA's ownership.

Goldberg argues that this ownership contest itself made turnover categorically unavailable. He relies on decisions stating that "there must be no dispute" that the property sought is property belonging to the debtor, *Kaspar*, 667 B.R. at 220, or that "Turnover is not appropriate where there is a legitimate dispute over ownership of the property," *In re Abeinsa Holding Inc.*, 653 B.R. 713, 720–21 (D. Del. 2023) (citation omitted).

Read in context, however, these formulations refer to a *bona fide* and unresolved dispute. They do not mean that a defendant can defeat turnover simply by asserting ownership, no matter how insubstantial the asserted interest or how conclusively it is defeated by the governing law and undisputed record.

The disputed-property limitation prevents a party from using turnover to create an asset that the debtor did not previously possess. Thus, turnover cannot be used to liquidate an unadjudicated contract claim, establish the amount of a disputed debt, or recover property to which the debtor has no present title without first obtaining a judgment under non-bankruptcy law. *See United States v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C. Cir. 1991); *Hirsch v. London Steam-Ship Owners' Mutual Life Insurance Ass'n Ltd.* (*In re Seatrain Lines, Inc.*), 198 B.R. 45, 50 n.7 (S.D.N.Y. 1996); *Hassett v. BancOhio National Bank* (*In re CIS Corp.*), 172 B.R. 748, 759–60 (S.D.N.Y. 1994); *In re Charter Co.*, 913 F.2d 1575, 1579 (11th Cir. 1990). These cases distinguish the collection of property *already* belonging to the debtor from the "creation, recognition or liquidation" of a claim that would become property only if the debtor prevailed in separate litigation. *In re CIS Corp.*, 172 B.R. at 759; *see also In re General Media, Inc.*, 335 B.R. 66, 75–77 (Bankr. S.D.N.Y. 2005).

*Abeinsa* illustrates that distinction. There, the debtor had paid funds years before bankruptcy and sought to recover them on the theory that a California statute created a right to

disgorgement. The court held that the plaintiff was seeking property "allegedly owed to the Estate," rather than property the debtor already owned, and so could not use § 542 as an independent source of substantive liability after its state-law disgorgement theory failed. 653 B.R. at 721–22 (quoting *In re Hechinger Investment Co. of Delaware, Inc.*, 282 B.R. 149, 162 (Bankr. D. Del. 2002)). Similarly, turnover is premature when the plaintiff must first avoid a transfer before the property can belong to the debtor. *See In re Student Finance Corp.*, 335 B.R. 539, 554 (Bankr. D. Del. 2005).

This case is different. PPVA sought the return of the value of a specific, identifiable security that PPVA owned when the Cayman liquidation commenced and that Goldberg later purported to acquire through a void (quite possibly fraudulent) disposition. The ownership issue was not merely assumed as part of the turnover claim. It was fully litigated in an adversary proceeding on a developed evidentiary record and competing motions for summary judgment. Adv. Dkt. Nos. 23, 30-1. The bankruptcy court then determined that no genuine dispute of material fact remained concerning ownership. App'x 60–80.

The mere existence of competing legal arguments did not prevent the bankruptcy court from making that ownership determination. Whether a dispute is *bona fide* turns on whether there is an objective basis for a factual or legal challenge to the debtor's ownership – not on whether the defendant has uttered the word "dispute." *See Giuliano v. Fairfield Group Health Care Centers Ltd. Partnership* (*In re Lexington Healthcare Group, Inc.*), 363 B.R. 713, 716 (Bankr. D. Del. 2007) (quoting *Matter of Busick*, 831 F.2d 745, 750 (7th Cir. 1987)). A conclusory or unsupported assertion that property does not belong to the debtor is insufficient. *In re CIL Ltd.*, 2024 WL 1693626, at *46.

Consistent with that principle, the bankruptcy court has authority to examine an asserted adverse interest and determine whether it is *bona fide*. *Pali Holdings* explains that a turnover proceeding invokes the bankruptcy court's *in rem* authority to determine claims to the property in question and that the court may grant turnover when the asserted defenses are not "real and substantial." 488 B.R. at 851–53. *Kaspar* likewise did not end its analysis upon observing that the property had been claimed by competing parties. It examined the governing state law and the parties' legal and equitable interests in the escrowed funds to determine whether the debtor possessed the ownership interest necessary for turnover. 667 B.R. at 220–24.

Here, Goldberg received that adjudication. As Sections III(A) and III(B) explain, the Term Sheets did not presently transfer the Warrant or its predecessor securities to him; the reciprocal exchange contemplated by those Agreements was never completed; and the October 2016 assignment was a void post-commencement disposition of PPVA's property. Goldberg's claim to ownership therefore fails as a matter of law. Once that claim is resolved, there is no remaining *bona fide* ownership dispute that prevents turnover.

The recent decision in *In re Crane Enterprises LLC*, 2026 WL 924070 (S.D.N.Y. Apr. 6, 2026) reinforces the point. There, occupants resisted turnover of a cooperative apartment by asserting a lifetime lease. *In re Crane Enters. LLC*, 2026 WL 924070, at *2. After the asserted leasehold interest was conclusively rejected, the bankruptcy court granted summary judgment ordering turnover, and the district court affirmed. *Id.* at *3–5. The fact that the defendants continued to assert the competing interest did not perpetually place the property beyond § 542's reach once that interest had been legally foreclosed. *See id.*

Goldberg's contrary interpretation would make turnover unavailable whenever the possessor of property denied the debtor's title – even if the denial rested on an unambiguous

contract, undisputed facts, or a previously adjudicated claim. That would convert the disputed-property limitation from a means of separating genuine state-law claims from true turnover proceedings into a unilateral veto exercisable by any person who refused to surrender the debtor's property. Neither § 542 nor the cases construing it support that result.

PPVA established that the Warrant belonged to it when the Cayman liquidation commenced, that Goldberg possessed or controlled the Warrant or the property derived from it during the Chapter 15 case, and that the Warrant had more than inconsequential value. Sections 1521(a)(5) and (a)(7) therefore authorized the bankruptcy court to entrust the Warrant or its value to the Liquidators. The bankruptcy court properly entered summary judgment on PPVA's turnover claim. App'x 78–80.

### D. The Bankruptcy Court's Damages Award Was Not Clearly Erroneous

After granting summary judgment to PPVA on liability, the bankruptcy court conducted a two-day trial to determine the value of the PPVA Warrant. It credited the testimony and report of PPVA's valuation expert, Steven Napier, and found that the Warrant had a fair market value of $4,069,186.06 on October 17, 2016. App'x 105–19. The court also awarded PPVA $3,052,224.00 in prejudgment interest. App'x 120–24. Goldberg argues that PPVA was not entitled to any damages and, alternatively, that the bankruptcy court's valuation overstated the Warrant's value. Neither argument warrants reversal.

The proper measure of damages presents a legal question, while the value produced by applying that measure to the evidence is a factual determination. *See United States v. Broadcast Music, Inc.*, 426 F.3d 91, 95–96 (2d Cir. 2005). The bankruptcy court's factual findings following trial – including its assessment of the competing valuation evidence and the credibility and weight of the witnesses' testimony – are reviewed only for clear error. *See In re Ames Department Stores,*

*Inc.*, 582 F.3d 422, 426 (2d Cir. 2009); *In re CBI Holding Co.*, 529 F.3d 432, 449–51 (2d Cir. 2008). This standard does not permit this Court to reweigh the evidence or reverse merely because it might have reached a different valuation in the first instance. If the bankruptcy court's account of the evidence is plausible when the record is viewed as a whole, it must be sustained; where the evidence permits two reasonable views, the factfinder's selection between them cannot be clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–75 (1985).

The Second Circuit has applied those principles specifically to a damages determination reached after a bench trial. In *Process America, Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141–43 (2d Cir. 2016), the court emphasized that an appellate court may not second-guess credibility determinations or the factfinder's selection between permissible views of the evidence. It affirmed an expert-based damages calculation where the opposing expert identified only speculative alternative explanations and offered no supported alternative calculation. *Id.* Bankruptcy valuation likewise does not demand a single rigid methodology. Because value varies with time and circumstances, the factfinder must remain free to employ the means most appropriate to the asset and the evidentiary record. *In re Roblin Industries, Inc.*, 78 F.3d 30, 38 (2d Cir. 1996) ("[T]he matrix within which questions of solvency and valuation exist in bankruptcy demands that there be no rigid approach taken to the subject." (citation omitted)).

1. <u>The Warrant's Value on October 17, 2016 Was the Proper Measure of Recovery</u>

Section 542(a) expressly permits recovery of either the property subject to turnover "or the value of such property." 11 U.S.C. § 542(a). Turnover is principally restitutionary, and property that remains intact ordinarily should be returned in kind. *See In re Pali Holdings, Inc.*, 488 B.R. 841, 849 (Bankr. S.D.N.Y. 2013). But return in kind is not required when the property has been dissipated or no longer retains the value it possessed when it was taken from the debtor. *In re P*

*& Z Island Farms, Inc.*, 478 F. Supp. 529, 534–35 (S.D.N.Y. 1979). Property may be dissipated not only through its sale or destruction, but also through a "dramatic decline in market value." *Id.* at 534. When that occurs, the appropriate remedy is restoration of the property's value at the time of the transfer. *Id.* at 535.

That is what occurred here. After Navidea reissued the Warrant in Goldberg's name, Goldberg exercised it and obtained the 5,411,850 underlying shares. App'x 449–50. By November 2024, Navidea common stock – which had traded at $0.8656 per share on October 17, 2016 – was trading at approximately $0.0005 per share. App'x 1063–67. Requiring Goldberg to return the resulting shares at their substantially diminished value would not restore what PPVA lost. The bankruptcy court therefore properly awarded the value of the Warrant rather than ordering the return of property that no longer retained anything approaching its former value.

The bankruptcy court also selected the proper valuation date. October 17, 2016 was the date on which Navidea reissued the Warrant in Goldberg's name and PPVA was deprived of its property. App'x 431–46. Goldberg did not dispute the validity of that valuation date before the bankruptcy court. App'x 117 n.6. And *P & Z Island Farms* supports valuing property as of the date on which it was transferred away from the debtor. 478 F. Supp. at 534–35.

The selected date is also consistent with the cases addressing the deprivation of stock options and warrants. In *Hermanowski v. Acton Corp.*, 729 F.2d 921, 922–23 (2d Cir. 1984) (per curiam), the Second Circuit agreed that damages should be measured as of the date of breach and that the proper measure was "the difference between the market value of the stock and the option price." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196–98 (2d Cir. 2003) similarly treated a warrant as analogous to a stock option and held that its value must be measured on the date the holder was deprived of it, rather than at a later date selected with hindsight. *See also*

*Lucente v. International Business Machines Corp.*, 310 F.3d 243, 261–63 (2d Cir. 2002); *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145–47 (1971). Although these decisions arose in contract actions rather than turnover proceedings, they confirm both the economic logic of the bankruptcy court's valuation date and the use of the underlying shares' market value as the starting point for valuing the Warrant.

2. The Bankruptcy Court Properly Applied a Fair-Market-Value Standard

Fair market value ordinarily is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *Connelly v. United States*, 602 U.S. 257, 260 (2024) (citation omitted). As Judge Kaplan has observed, it is "the price that a willing buyer and a willing seller would agree to in an arm's length transaction." *Arthur Properties, S.A. v. ABA Gallery, Inc.*, 2011 WL 5910192, at *3 (S.D.N.Y. Nov. 28, 2011) (quoting *Broadcast Music*, 426 F.3d at 95); *see also Keator v. State*, 23 N.Y.2d 337, 339 (1968).

The exception recognized in *Keator* for specialty property lacking any recognizable market does not apply. The PPVA Warrant conferred the right to purchase a fixed number of shares of a publicly traded company for a nominal exercise price. Its value could therefore be derived from an observable market price, adjusted to account for the costs and restrictions associated with exercising and monetizing the Warrant.

Goldberg argues that a hypothetical buyer would have discounted the Warrant – or refused to purchase it altogether – because certain public filings stated that Goldberg possessed voting and dispositive power over the underlying securities. Dkt. No. 17 at 45–50. This argument merely repackages the ownership theory rejected above. As Sections III(A) and III(B) explain, Goldberg had not acquired ownership of the Warrant or the securities for which it had been exchanged, and

the purported October 2016 assignment was void. PPVA therefore owned the Warrant, and the Liquidators possessed the authority, subject to the requirements of the Cayman liquidation, to realize its value.

Goldberg is nevertheless correct about one premise. The hypothetical buyer cannot simply be endowed with knowledge of a judicial decision entered years after the valuation date. Fair market value must be determined from the facts and circumstances reasonably knowable on the historical valuation date, rather than through hindsight. *See Estate of Newhouse v. Commissioner*, 94 T.C. 193, 218 (1990); *In re Coated Sales, Inc.*, 144 B.R. 663, 668 (Bankr. S.D.N.Y. 1992). And where genuine legal uncertainty existed at that time, the uncertainty itself may affect what a willing buyer would pay. In *Newhouse*, for example, the parties presented extensive, conflicting opinions from multiple respected corporate-law experts, and neither side's interpretation of the relevant stock rights was patently unreasonable. The Tax Court therefore declined to "postulate a certainty that did not exist" on the valuation date. 94 T.C. at 231–32.

But *Newhouse* does not require an additional discount whenever a litigant later advances a competing interpretation of the governing documents. Goldberg identified no comparable body of conflicting legal advice concerning the PPVA Warrant. He offered no independent legal opinion, testimony from an actual or prospective purchaser, failed transaction, evidence of an actual market reaction, or calculation of the price effect supposedly attributable to his asserted rights. To be sure, Amendment No. 2 to Schedule 13D, which was admitted as Defendant's Exhibit 9, excluded the 5,411,850 underlying shares from the reporting persons' beneficial-ownership calculation as shares "owned by" Goldberg and stated that he possessed sole voting and dispositive power over them. App'x 676–87, 1013, 1294–95. But it said nothing about the effect of Goldberg's asserted interest on the Warrant's market value. Thus, the bankruptcy court had before

it the substance of the public disclosure on which Goldberg relies, but no evidence that the disclosure would have caused a willing buyer to reduce the price of the Warrant by any particular amount.

The purported effect of Goldberg's asserted ownership was also squarely tested at trial. Goldberg cross-examined Napier about the Term Sheets and public filings. Napier acknowledged that he had not independently analyzed those materials in preparing his report. He maintained, however, that his valuation proceeded on the assumption – drawn from the summary-judgment ruling – that an informed buyer would treat PPVA as the owner of the Warrant and as having authority to sell it. App'x 1123–29, 1163, 1172–75. The bankruptcy court was entitled to credit Napier's valuation despite that limitation and to conclude that Goldberg had not established an additional, quantifiable discount attributable to the asserted ownership "cloud." *See Process America, Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141–43 (2d Cir. 2016); *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 334–35 (2d Cir. 1993) (concluding that criticisms of the damages expert's estimates went to the weight of the evidence and presented factual questions for the factfinder).

Napier's initial failure to review every contract and filing therefore furnished a legitimate subject for cross-examination, but it did not compel rejection of his valuation. The premise that PPVA owned the Warrant was a legal determination for the court. The separate factual question was whether the record established an additional market discount arising from uncertainty about that ownership. Goldberg did not quantify such a discount, and the bankruptcy court did not clearly err in finding that the evidence failed to establish one.

3. <u>The Bankruptcy Court's Calculation Was Supported by the Record</u>

The law does not require PPVA to establish the Warrant's value with mathematical precision. Once the fact of economic loss is established, the claimant must provide a "stable foundation for a reasonable estimate" of the amount. *Process America*, 839 F.3d at 141 (citation omitted). Uncertainty as to the amount of a proven loss does not require an award of nominal damages where the evidence permits a reasoned estimate. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–66 (1931).

Napier's calculation proceeded from objective market data. The Warrant entitled its holder to purchase 5,411,850 shares of Navidea common stock. On October 17, 2016, Navidea common stock closed at $0.8656 per share, producing an intrinsic value of $4,684,497.36. The holder would have been required to pay one cent per share to exercise the Warrant, for a total exercise cost of $54,118.50. Subtracting that cost yielded an unadjusted fair market value of $4,630,378.86. App'x 724; *see also* App'x 1061–71.

Napier did not treat that unadjusted figure as the Warrant's final value. He applied a discount for lack of marketability to account for the practical restrictions and risks associated with converting the Warrant into cash. His analysis considered the holding period for the unregistered underlying shares, the Warrant's beneficial-ownership blocker provisions, the size of the block of Navidea shares, the period required to dispose of that block, and the volatility of Navidea's common stock. App'x 708–24, 1071–77. Using commonly employed valuation techniques, including put-option models and comparable restricted-stock transactions, Napier calculated a discount range of 8.8% to 15.4%. That produced a value range of $3,916,130.27 to $4,222,241.85. He selected the midpoint, $4,069,186.06, as the Warrant's fair market value. App'x 724, 1076–77.

This treatment is consistent with the relevant valuation authorities. The New York Court of Appeals has recognized that, where securities are subject to resale restrictions, their market value "would have to be discounted in some way." *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 147 (1971). Other courts likewise treat restrictions on transfer, the required holding period, registration costs, the degree of control conveyed, and the size of the block as conventional components of a marketability discount. *See Mandelbaum v. Commissioner*, T.C. Memo. 1995-255, 1995 WL 350881, at *11, *aff'd*, 91 F.3d 124 (3d Cir. 1996); *Estate of Newhouse*, 94 T.C. at 217–18. Both the valuation itself and the appropriate marketability or blockage discount are factual determinations entrusted principally to the trial court. *See Estate of Ford v. Commissioner*, 53 F.3d 924, 926–28 (8th Cir. 1995).

Goldberg's principal criticisms were thus directed at matters Napier had already incorporated into his analysis. Contrary to Goldberg's contention, Napier did not assume that the Warrant was as marketable as freely tradeable Navidea shares. The six-month holding restriction and registration period were components of the marketability discount. App'x 1071–74. Nor did he ignore the size of the block. He considered the additional period required to dispose of more than five million shares without unduly affecting the market. App'x 1074–76. And the blocker provisions were among the restrictions incorporated into the discount. App'x 118–19.

Goldberg also asserted that sales of other Navidea shares held in the Cayman liquidation could depress the market price. But he introduced no evidence quantifying those holdings, showing when or how they would be sold, or calculating their likely effect on Navidea's trading price. App'x 117–18. He likewise supplied no alternative numerical valuation that incorporated such an effect. The bankruptcy court did not clearly err by declining to reduce the Warrant's value based on an unquantified and speculative possibility.

Nor does the availability of registered Navidea shares in the public market establish that the Warrant lacked value. A buyer would not reasonably pay the full value of freely tradeable shares for a Warrant whose underlying shares were subject to holding and registration restrictions. But Napier's valuation did not assume otherwise. It subtracted the exercise cost and then imposed a substantial marketability discount. The existence of those restrictions justified a discount; it did not compel a finding that the Warrant was worthless.

Goldberg was permitted to testify as a nonretained valuation expert, and his report was admitted without objection. App'x 848. The bankruptcy court therefore had the benefit of both parties' valuation positions. But Goldberg's asserted value of zero rested on the legal proposition that PPVA lacked authority to sell the Warrant because he, Goldberg, was the actual owner of the Warrant. Both the bankruptcy court and now this Court have rejected that proposition. Goldberg did not offer a conventional alternative valuation isolating the economic effect of the restrictions that Napier allegedly undervalued.

The bankruptcy court considered Goldberg's criticisms, credited Napier's methodology and testimony, and found the resulting valuation reasonable. App'x 117–19. The choice was supported by objective market data, the terms of the Warrant, and a methodology that accounted for the restrictions Goldberg identified. At most, Goldberg has shown that another factfinder might have selected a different point within the range or applied a larger discount. That is not clear error. *See Anderson*, 470 U.S. at 573–75; *In re CBI Holding*, 529 F.3d at 450–51; *see also Process America*, 839 F.3d at 141–43. The award of $4,069,186.06 is therefore AFFIRMED.

4. <u>The Prejudgment-Interest Award Was Within the Bankruptcy Court's Discretion</u>

Goldberg does not separately challenge the bankruptcy court's selection of the nine-percent rate, the October 17, 2016 accrual date, the February 14, 2025 end date, or the calculation of the

interest award. His challenge to prejudgment interest is derivative of his contention that PPVA was not entitled to any principal recovery. *See* Dkt. No. 17 at 41–53. Because the principal award is affirmed, Goldberg's derivative argument fails.

In any event, the bankruptcy court acted within its discretion. When a federal statute does not address prejudgment interest, a court may award interest after considering the need to compensate the injured party fully, the relative equities, the statute's remedial purpose, and other relevant circumstances. *Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831, 833–36 (2d Cir. 1992). The decision whether to award interest and the selection of an appropriate rate are committed to the trial court's broad discretion, but the rate must be tied to the compensatory purpose of the award and supported by an explanation permitting appellate review. *See Jones v. UNUM Life Insurance Co. of America,* 223 F.3d 130, 139–40 (2d Cir. 2000); *Commercial Union Assurance Co. v. Milken*, 17 F.3d 608, 613–14 (2d Cir. 1994). Courts in this District have applied these principles to turnover claims, recognizing that prejudgment interest may be necessary to compensate a debtor for the lost use and time value of property wrongfully withheld. *See In re Tapmasters Chelsea, LLC*, 621 B.R. 580, 584–87 (Bankr. S.D.N.Y. 2020); *In re FKF 3, LLC*, 2018 WL 5292131, at *12–16 (S.D.N.Y. Oct. 24, 2018); *In re Pali Holdings, Inc.*, 491 B.R. 389, 390–95 (Bankr. S.D.N.Y. 2013).

These considerations favor an award here. PPVA was deprived of a Warrant worth more than $4 million in October 2016 and remained unable to realize that value for more than eight years. Interest compensates PPVA and its creditors for that lost use. *See Wickham*, 955 F.2d at 833–36. The subsequent collapse in the value of Navidea's shares strengthens rather than weakens the conclusion. *P & Z Island Farms* specifically recognizes that, when transferred property undergoes a dramatic decline in value, restoration of its value at the time of transfer together with

interest is necessary to compensate the owner. 478 F. Supp. at 534–35. Returning nearly worthless shares without interest would instead leave PPVA bearing the entire loss attributable to the period during which Goldberg controlled the asset.

The bankruptcy court also acted within its discretion in selecting New York's statutory rate. Although turnover is a federal remedy, the property rights enforced through that remedy were governed by New York law. *See Tapmasters*, 621 B.R. at 584. New York law provides for interest upon a sum awarded because of an act "depriving or otherwise interfering with title to, or possession or enjoyment of, property," N.Y. C.P.L.R. § 5001(a), and sets the applicable rate at nine percent per year, *id.*, § 5004. The bankruptcy court reasonably selected that rate as an appropriate measure of the time value of the property of which PPVA had been deprived. App'x 122–23.

Finally, October 17, 2016 was the appropriate accrual date. It was the date on which the Warrant was reissued in Goldberg's name and PPVA lost the ability to realize its value. *See* N.Y. C.P.L.R. § 5001(b) (interest runs from "the earliest ascertainable date the cause of action existed"); *P & Z Island Farms*, 478 F. Supp. at 535. The bankruptcy court calculated simple interest only through February 14, 2025 – a date preceding entry of the final judgment – and awarded $3,052,224.00. App'x 123–24. Goldberg identifies no error in that calculation.

The bankruptcy court properly considered the nature of the turnover claim, the application of New York law to the underlying property rights, the nearly nine years during which PPVA was deprived of the Warrant's value, and the need to compensate PPVA and the creditors in the Cayman liquidation. The bankruptcy court's award of $4,069,186.06 in turnover damages and $3,052,224.00 in prejudgment interest is therefore AFFIRMED.

**Conclusion**

For the foregoing reasons, the Bankruptcy Court's May 10, 2022 Modified Bench Decision and Order on Cross-Motions for Summary Judgment, Adv. Dkt. No. 44, its September 30, 2025 Memorandum Opinion and Order Awarding Damages, Adv. Dkt. No. 143, and the October 8, 2025 judgment entered thereon, Adv. Dkt. No. 145, are AFFIRMED.

The Clerk of Court is respectfully directed to enter judgment in favor of Appellee and to close this case.

This constitutes the Opinion and Order of the Court. It is a written decision.

Dated: July 30, 2026
New York, New York

U.S.D.J.